UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JACK BIZELIA, *et al.*,

Plaintiffs,

-v-

CLINTON TOWERS HOUSING INC. and P&L MANAGEMENT AND CONSULTING, INC.,

Defendants.

20 Civ. 8065 (JPC)

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge:

Plaintiffs Jack Bizelia, Hripsime Harutyunyan, and Anahit Matevosyan, who are tenants in a subsidized apartment complex in Manhattan called Clinton Towers, bring this action against the entities that own and manage that complex, Defendants Clinton Towers Housing Inc. ("CT Housing") and P&L Management and Consulting, Inc. ("P&L"). Plaintiffs argue that Defendants engaged in disability discrimination in violation of the Fair Housing Act ("FHA") by not providing the reasonable accommodation of either placing them on a waiting list for transfer to a larger apartment in the complex or permitting their use of an alternative method to request such a transfer. With discovery complete, the parties have moved for summary judgment. For reasons explained below, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' motion pursuant to Federal Rule of Civil Procedure 56(f). *See* Fed. R. Civ. P. 56(f)(2) ("After giving notice and a reasonable time to respond, the court may . . . grant [a summary judgment] motion on grounds not raised by a party.").

## I. Background

### A. Facts[1]

#### 1. Mitchell-Lama Housing Program

New York's Mitchell-Lama Housing Program ("Mitchell-Lama") "promote[s] construction of so-called affordable housing by providing long-term, low-interest government mortgage loans to developers on the condition that the resulting development be subject to rent regulation." *United States v. Glenn Gardens Assocs., L.P.*, 534 F. App'x 17, 19 (2d Cir. 2013) (summary order). The New York City Department of Housing Preservation and Development ("HPD") "administers the Mitchell-Lama program in New York City and oversees all the program's housing complexes." *Astacio v. City of New York*, No. 23-7598, 2025 WL 80069, at *1 (2d Cir. Jan. 13, 2025) (summary order). Pursuant to HPD regulations, published in Title 28 of the Rules of the City of New York ("RCNY"), all housing companies that construct Mitchell-Lama housing must select a managing agent to provide management services for the property. 28 RCNY § 3-16(a).

Any New York State resident may apply for an apartment in a Mitchell-Lama development. *Id.* § 3-02(h)(2). Applicants are then placed on waiting lists maintained by the housing companies on HPD-approved forms. *Id.* § 3-02(h)(8)(i). On the waiting lists, each applicant is "listed in chronological order, by apartment size, by date of receipt or order of selection by lottery, as applicable," *id.*, and such waiting lists must be made available for inspection and posted in either

[1] The facts throughout this Opinion and Order are drawn from the parties' statements and counterstatements of undisputed material facts submitted pursuant to Local Civil Rule 56.1, Dkt. 208 ("Defts. 56.1 Stmt."); Dkt. 213 at 1-16 ("Pls. 56.1 Counter Stmt."); Dkt. 213 at 17-24 ("Pls. 56.1 Stmt."); Dkt. 218 ("Defts. 56.1 Counter Stmt."), as well as the declarations filed by the parties with attached exhibits, Dkt. 206-1 ("Piantadosi Decl."); Dkt. 206-2 ("Bart Decl."); Dkt. 214 ("Cyr Decl."); Dkt. 212 ("Harutyunyan Decl."). Unless otherwise noted, the Court cites only to a party's statement of undisputed material facts when the opposing party does not dispute the fact, has not offered admissible evidence to refute it, or merely seeks to add its own "spin" on the fact or otherwise disputes the inferences drawn from it.

the management office or the lobby of each building in the housing development, *id.* § 3-02(h)(10). If an applicant believes that his or her name has been erroneously omitted from a waiting list, the applicant may challenge that omission, and, if successful in presenting sufficient documentation substantiating the error, the applicant's name "shall be inserted into the waiting list in the corrected date order." *Id.* § 3-02(h)(11).

When a unit becomes available, the unit is generally offered to the first applicant on the waiting list, *id.* § 3-02(h)(12), but current tenants of a Mitchell-Lama development—*i.e.*, those tenants seeking to transfer to a different apartment within the same development—have first priority for available units, *id.* § 3-02(i)(1). At the time when a unit is offered, the applicant "shall be investigated by the housing company" to determine their eligibility. *Id.* § 3-02(h)(4). In that investigation, the applicant and his or her household members must prove that they do not exceed the applicable maximum income for the size of their household, and that the size of the unit they applied for is appropriate given their household size. *See id.* § 3-02(h)(2)(iii), (h)(9), (l)(1)(i)-(ii), (m). If the housing company concludes the applicant does not meet these eligibility requirements, it must indicate the reason for disapproval on the rejected application, maintain its records for HPD inspection, and inform the applicant of the reason for the rejection and the procedures for appeal. *Id.* § 3-02(h)(6). If the housing company concludes that the applicant is eligible, the full application and supporting data "shall be forwarded to HPD for its approval." *Id.* § 3-02(h)(4). And if HPD also approves the application, then the applicant can move into their apartment. *Id.* § 3-02(n)(1).

**2. The Clinton Towers Apartment Complex**

The Clinton Towers apartment complex, located at 790 11th Avenue in Manhattan, is part of Mitchell-Lama. Defts. 56.1 Stmt. ¶ 11. Clinton Towers is owned by CT Housing, *id.* ¶¶ 4, 8, and P&L is the apartment complex's managing agent, *id.* ¶ 6. CT Housing maintains separate waiting lists for one-, two-, three-, and four-bedroom apartments. *Id.* Under CT Housing's policy

for existing Clinton Towers residents seeking transfer to a new unit, "[r]equests for transfer must be made in writing." Piantadosi Decl., Exh. C (Clinton Towers tenant transfer policy). Defendants contend that CT Housing requires that all transfer requests be made on an "HPD-approved application form." Piantadosi Decl. ¶ 19; *see* Piantadosi Decl., Exh. D (Clinton Towers transfer application form). Plaintiffs dispute the existence of such a requirement, however, pointing to deposition testimony from Tonia Blaine, a former onsite manager at Clinton Towers, who stated that "to get on the [waiting] list," a tenant need only "bring down a notification in writing, a letter that says hi, I live in apartment such and such at this development and I would like to be transferred to a two bedroom, a three bedroom, whatever it is you are looking for, and you go on the list." Cyr Decl., Exh. C ("Blaine Dep. Tr.") at 65:12-66:11.

**3. Plaintiffs' Efforts to Transfer Apartments**

Bizelia, Harutyunyan, and Matevosyan are co-tenants of a one-bedroom apartment in Clinton Towers. Defts. 56.1 Stmt. ¶¶ 20-23. Both Bizelia and Matevosyan suffer from medical issues. Bizelia has been diagnosed with "mood disorder, Obsessive Compulsive Disorder, [and] Generalized Anxiety Disorder." Cyr Decl., Exh. H (3/22/2022 medical note); *accord* Cyr Decl., Exh. G (4/15/2021 medical note, reporting the same conditions); *see* Cyr Decl., Exh. F (11/26/2018 medical note, reporting "anxiety, symptoms of depressed mood, claustrophobia[, and] difficulty interacting with people [and] handling stressful situations"). As a result of these conditions, Bizelia experiences "mood swings, depress[ion], [and] severe anxiety, worries a lot, [and is] easily overwhelmed and claustrophobic." Cyr Decl., Exh. H (3/22/2022 medical note). When a "room is crowded," he is "unable to breath[e] well," has "palpitation[s]," and "feels that walls are coming close towards him." Cyr Decl., Exh. G (4/15/2021 medical note). Bizelia additionally "suffers from chronic allergi[c] sinusitis," and therefore has been advised by a doctor that he should live in an "apartment free of serious allergens." Cyr Decl., Exh. I (7/12/2017 medical note). Matevosyan,

for her part, is an "elderly [woman] who suffers from [a] heart condition, high blood pressure, anxiety and hypertension." Cyr Decl., Exh. K (10/21/2019 medical note). As of October 21, 2019, she was "taking medications for these medical conditions and has a pacemaker." *Id.*

Beginning as early as November 2016, Bizelia, Matevosyan, and Harutyunyan sought to move into a larger apartment in Clinton Towers. On November 21, 2016, Bizelia wrote a letter to Blaine stating: "Since we are three people in a 1-bedroom apt, and apt is to[2] small. I am requesting that you please add our name to 2-Bedroom Terrace Apt A.S.A.P." Cyr Decl., Exh. R. Then, in or around July 2017, Bizelia wrote another letter to Blaine, this time stating: "This is to kindly remind you that we are 3-people living in a one bedroom small apartment with not enough space for three of us. One of us is a senior with a heart condition. I have breathing disorders and allergies[3] due to no ventilation and a smoking vapor that is entering our apartment causing my ill health. . . . We need to be moved to 2-bedroom apartment as soon as possible." Cyr Decl., Exh. S.[4]

By December 2017, Bizelia's name was on a Clinton Towers waiting list for transfer to a particular two-bedroom apartment in the complex. Piantadosi Decl. ¶ 34. Also in December 2017, P&L forwarded Bizelia's application package to HPD for approval or rejection of his transfer to

---

[2] The communications quoted herein are recited in their native form, aside from the insertion of ellipses, without any typographical errors corrected.

[3] According to Plaintiffs' Rule 56.1 statement, on July 12, 2017, Bizelia delivered to Defendants a letter from his doctor "informing Defendants that he suffers from chronic allergi[c] sinusitis with near complete blockages, and he should have an apartment free of serious allergens." Pls. 56.1 Stmt. ¶ 7. But no evidence in the record shows that such a letter was ever delivered to Defendants. *See* Defts. 56.1 Counter Stmt. ¶ 7 (disputing Plaintiffs' statement). In support of this statement, Plaintiffs cite a "medical note" from a doctor, *see* Pls. 56.1 Stmt. ¶ 7 (citing Cyr Decl., Exh. I), but that note is not addressed to Defendants and there is no indication that they ever received it.

[4] Bizelia's July 2017 letter stated that he had "enclosed [] medical documentation regarding [his] serious health condition." Cyr Decl., Exh. S. But at least in the version of that letter submitted by Plaintiffs in connection with the summary judgment motions, no medical documentation was included. *See generally id.*

that two-bedroom apartment. *Id.* But HPD rejected Bizelia's transfer on December 21, 2017. *Id.*

Following that rejection by HPD, Bizelia placed his household on a Clinton Towers waiting list for a three-bedroom unit. *Id.* ¶ 35. As before, such an apartment became available at the complex, and once again, P&L forwarded Bizelia's application package to HPD for approval or rejection. *Id.* But on February 18, 2018, HPD rejected Bizelia's transfer to that three-bedroom apartment as well. *Id.*; *see* Piantadosi Decl., Exh. K (notice of application rejection dated February 18, 2018). In its rejection notice, HPD explained that Bizelia's application was being rejected because it did "not meet the occupancy standards for apartment size." Piantadosi Decl., Exh. K. Presumably, that was because a three-bedroom apartment is generally only available for households of four to six people, *see* 28 RCNY § 3-02(m)(1)(iii), yet Bizelia's household numbered three people: Bizelia, Harutyunyan, and Matevosyan.

Mitchell-Lama authorizes HPD to "grant waivers of occupancy standards for medical reasons," *id.* § 3-02(m)(1)(vii), so on February 23, 2018, Bizelia and Harutyunyan submitted a letter to HPD, requesting a medical waiver that would make them eligible to transfer to a three-bedroom unit, Cyr Decl., Exh. T; *see also* Bart Decl., Exh. U ("Harutyunyan Dep. Tr.") at 60:5-16 (testifying that the letter was delivered directly to HPD). Bizelia and Harutyunyan wrote "that two members of household have a medical conditions. The apartment is two small and heavy smoking fumes coming into our small one bedroom apartment with no good ventilation." Cyr Decl., Exh. T. HPD responded to Bizelia in a letter dated April 16, 2018, denying the request for a medical waiver. Piantadosi Decl., Exh. N. But in that letter, HPD advised Bizelia, "you have the correct family composition to occupy a two-bedroom apartment," and "[i]f you wish to obtain a two-bedroom apartment please notify management and your name will be added to the internal two-bedroom waiting list." *Id.*

After HPD denied his request for a medical waiver, Bizelia continued to seek a transfer to

a larger apartment at Clinton Towers. On April 19, 2018, Bizelia wrote a letter to "office Manager" (presumably, Blaine) stating: "This is second request for apartment transfer. Enclosed copy of previous letter sent to your office Certified Mail[] (with updated medical notes, and proofs what was requested)." Cyr Decl., Exh. V.[5] Then, on June 7, 2018, Bizelia and Harutyunyan wrote a letter to "Management" stating: "We as a family are alerting you to a serious complaint due to discrimination, pure racism, harassment, negligence and aggravation. . . . Knowing that two people in our house hold had serious medical issues, we were passed up for apts and apts. were given to other tenants, even she [presumably, Blaine] claimed we were first on the list. She lied and discriminated against us. We need to be transferred to 3-bedroom apt. asap. due to our serious health risks." Cyr Decl., Exh. W. Also on June 7, 2018, someone using the name "pegas sagep" sent an email, from the address "pegasart8@gmail.com," to Melissa Sabovik, a P&L employee, with several letters that Bizelia had previously sent to Defendants, along with a note from Bizelia's doctor. Cyr Decl., Exh. EE ("Sabovik Email") at 2. On August 18, 2018, Sabovik responded to "pegas sagep": "All your documents are clearly stating the 2 bedroom has been approved by HPD and CT Management has a 2 Bedroom to show you." *Id.* at 1.[6] Blaine then showed Harutyunyan

---

[5] As with his July 2017 letter, *see supra* n.4, it is not clear what, if any, medical documentation Bizelia included with this April 19, 2018 letter because no medical documentation is attached in the version that Plaintiffs filed. *See generally* Cyr Decl., Exh. V.

[6] At certain points, Plaintiffs suggest that Sabovik's email proves that they satisfied the eligibility requirements for a larger unit. *See, e.g.*, Dkt. 211 ("Pls. Motion") at 14, 15, 17, 21. But none of the documents attached to the email from "pegas sagep" to Sabovik indicates that HPD had approved Plaintiffs for a two-bedroom unit. *See generally* Cyr Decl., Exh. EE. In fact, under New York City law, HPD reviews an applicant's eligibility only *after* the applicant is offered a unit. 28 RCNY § 3-02(h)(4). And Plaintiffs do not dispute that on December 21, 2017, HPD had determined that Plaintiffs were ineligible for a transfer to a larger unit. Piantadosi Decl. ¶ 34. Nor do they submit any proof that their joint income was below the applicable household maximum. *See* 28 RCNY § 3-02(h)(9), (l)(1)(i)-(ii). To be sure, HPD's April 2018 letter rejecting Bizelia's request for a medical waiver did advise him that "you have the correct family composition to occupy a two-bedroom apartment." Piantadosi Decl., Exh. N. But this letter did not speak to Bizelia's eligibility, because a household's family composition has no bearing on whether that household's joint income exceeds the allowable maximum. *See* 28 RCNY § 3-02(l)(1)(i)-(ii).

"a three-bedroom apartment and a two-bathroom apartment, which [Blaine] described as 'both available immediately.'" Harutyunyan Decl. ¶ 9. But according to Harutyunyan, Blaine then ignored her request to move into the three-bedroom unit, and when Harutyunyan followed up, Blaine responded, "You did this to yourself. You're going to suffer." *Id.* ¶¶ 10-11. *But see* Blaine Dep. Tr. at 253:2-15 (Blaine denying that she ever said that to Harutyunyan: "Absolutely not. . . . I don't want to see them suffer.").

Notwithstanding this latest setback, Plaintiffs continued to seek an apartment transfer. On February 4, 2019, Bizelia, Harutyunyan, and Matevosyan wrote in a letter: "We have been harassed and discriminated. . . . We have a smoke in our apt entering to vent, causing health problems for Jack Bizelia and Anahit Matevosyan. . . . Our letters regarding of 3 bedroom apartment upgrade expired couple of times as management stated and we filed it again." Cyr Decl., Exh. X.[7] On April 2, 2020, Bizelia, Harutyunyan, and Matevosyan wrote a letter to Tanya Williams, a property manager at CT Housing, stating: "We need an apartment transfer to 2 or 3 bedrooms since We are three people in one bedroom apartment. One person in house hold is disable, another person is a Senior Citizen with a heart condition." Cyr Decl., Exh. Z. Finally, on May 7, 2021, a lawyer from Housing Conservation Coordinators sent a letter to P&L on behalf of Bizelia, requesting "a reasonable accommodation of [Bizelia's] disability to transfer [into] a two-bedroom apartment." Cyr Decl., Exh. AA at 1. This May 2021 letter attached a note from a doctor which described Bizelia's diagnoses and opined that a larger unit might ameliorate his condition. *Id.* at 4.[8]

[7] While the Cyr Declaration describes this letter as having been sent "to Defendants," Cyr Decl. ¶ 25, the letter is only addressed, "To Whom It May Concern," Cyr Decl., Exh. X, and there is no evidence in the record showing whether it was sent to CT Housing, P&L, HPD, or some other entity.

[8] According to Plaintiffs' Rule 56.1 statement, Bizelia sent P&L, CT Housing, and HPD a letter from his doctor on June 24, 2019, and Matevosyan sent Defendants a letter from her doctor on October 21, 2019. Pls. 56.1 Stmt. ¶¶ 9 (citing Cyr Decl., Exh. Y), 16 (citing Cyr Decl., Exh. K). Neither letter is addressed to Defendants, however, nor does any evidence in the record reflect

In this entire period after their medical waiver request was denied by HPD in April 2018, none of the Plaintiffs ever submitted to P&L or CT Housing an application to transfer units using the building's "HPD-approved application form." Piantadosi Decl. ¶ 19; *see* Piantadosi Decl., Exh. D (Clinton Towers transfer application form); *compare* Defts. 56.1 Stmt. ¶ 40 ("[N]one of the Plaintiffs ever submitted a Transfer Request to place himself or herself or their household on an internal waiting list [after April 16, 2018]."), *with* Pls. 56.1 Counter Stmt. ¶ 40 (disputing whether the form is required but not contesting that Plaintiffs did not use the form to submit an application after 2018).[9] Bizelia was, however, "aware of the transfer policies" at the Clinton Towers apartment complex, including the fact that "[r]equests for transfer must be made in writing." Bart Decl., Exh. S ("Bizelia Dep. Tr.") at 80:10-22. Harutyunyan similarly understood "that a written application had to be filled out in order for tenants at Clinton Towers . . . to be put on a wait list." Harutyunyan Dep. Tr. at 41:6-18.

Plaintiffs' repeated attempts to transfer units have not been the only sources of conflict between Plaintiffs and Defendants. In 2017, CT Housing brought against Plaintiffs an eviction proceeding, which was settled on February 5, 2019. Piantadosi Decl. ¶ 50; Piantadosi Decl., Exh. P (settlement stipulation). Additionally, on July 1, 2019, Bizelia filed a complaint against Defendants with the New York State Division of Human Rights (the "NYSDHR"), alleging that Defendants discriminated against him on the basis of, *inter alia*, disability. Defts. 56.1 Stmt. ¶ 44; Piantadosi Decl. ¶ 54. But the NYSDHR determined that there was no probable cause to believe Defendants engaged in discrimination, and therefore terminated the proceeding on January 17,

---

that either was sent to Defendants.

[9] Harutyunyan claims that Blaine notified her that Plaintiffs "were first on the waiting list for a transfer to a two-bedroom apartment" at some point after April 16, 2018. Harutyunyan Decl. ¶ 7. But Plaintiffs offer no indication of when exactly this conversation occurred and provide no evidence suggesting that any such statement was accurate.

2020. Piantadosi Decl. ¶ 55, Exh. Q (NYSDHR determination).

Years of conflict over various issues created animosity between Plaintiffs and Defendants. For example, after Williams forwarded Bizelia's May 2021 letter to the President of P&L, the President responded, "There's a man who needs a beating." Cyr Decl., Exh. B. And as early as September 2018, the President of P&L emailed Blaine that he was looking forward to "tak[ing] these clowns [(*i.e.*, Plaintiffs)] to court." Cyr Decl., Exh. A.

**B. Procedural History**

Plaintiffs, initially proceeding *pro se*, commenced this action on September 29, 2020. Dkt. 2. On October 26, 2021, Plaintiffs filed an Amended Complaint, which alleges disability discrimination in violation of the FHA. Dkt. 44 ("Am. Compl."). Defendants moved to dismiss the Amended Complaint on December 22, 2021, arguing that Plaintiffs fail to allege a claim that accrued within two years of their commencement of the action. Dkt. 47. The Court denied Defendants' motion on May 31, 2022, due to factual disputes as to the timeliness of Plaintiffs' FHA claim. *Bizelia v. Clinton Towers Hous. Co., Inc.*, No. 20 Civ. 8065 (JPC) (OTW), 2022 WL 1747763, at *5 (S.D.N.Y. May 31, 2022); *see also id.* at *6 ("To be clear, the Court's decision today should not be construed as suggesting that Defendants will be unable to establish that Plaintiffs' claims are time-barred under the FHA. Rather, dismissal of Plaintiffs' claims at this stage of the litigation is not appropriate because there are material factual issues to be resolved." (citation omitted)).

On October 19, 2022, the Honorable Ona T. Wang, to whom this case had been referred for general pretrial supervision, directed the Clerk of Court to attempt to locate *pro bono* counsel to represent Plaintiffs. Dkt. 67. *Pro bono* counsel appeared to represent Plaintiffs on November 9, 2022. Dkts. 70-71. Discovery then proceeded until spring 2025.

On July 31, 2025, Defendants moved for summary judgment. Dkts. 206-208. Plaintiffs

opposed Defendants' motion and moved for partial summary judgment on September 5, 2025. Dkts. 210-214. Defendants opposed Plaintiffs' motion and filed a reply in support of their motion on November 7, 2025. Dkts. 218-222. Plaintiffs filed a reply in support of their motion on December 5, 2025. Dkt. 225 ("Pls. Reply").

On March 30, 2026, the Court ordered the parties to submit supplemental letter briefs addressing whether "a move to a different dwelling, as opposed to a change in rules, practices, or services pertaining to a plaintiff's current dwelling, is an accommodation under [the FHA]." Dkt. 230 (emphasis omitted). Plaintiffs and Defendants submitted supplemental letter briefs addressing this issue on May 1, 2026. Dkts. 235, 236. Then, on June 29, 2026, the Court gave "notice to the parties that it [was] considering granting summary judgment to Defendants on [two issues that] were not raised by either party." Dkt. 237. First, the Court was considering granting summary judgment because Plaintiffs' claim "sounds in disparate treatment as opposed to failure-to-accommodate" but Plaintiffs had "not met their burden of showing discriminatory intent" under such a theory. *Id.* Second, to the extent that Plaintiffs had requested an accommodation by seeking "a transfer to a larger unit, regardless of their spot on the waiting list or whether they met the eligibility requirements for such a unit," the Court was considering granting summary judgment on the basis that such an accommodation was not reasonable "because it would fundamentally alter the nature of the Mitchell-Lama housing program." *Id.* On July 31, 2026, the parties submitted supplemental briefs addressing these issues, Dkts. 243, 244 ("Pls. Supp. Br."), and on August 7, 2026, they submitted responsive briefs, Dkts. 245, 246 ("Pls. Supp. Reply").

## II. Legal Standard

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Said differently, "[s]ummary judgment is appropriate '[w]here the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

As relevant here, Federal Rule of Civil Procedure 56(f) "permits a district court to grant summary judgment on grounds not raised by a party[,] [b]ut a district court may do so only after giving notice and a reasonable time to respond." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (citation modified). "[C]are should be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." *Schwan-Stabilo Cosms. GmbH v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.").

## III. Discussion

### A. Applicable Law

The FHA states that "[i]t is the policy of the United States to provide . . . for fair housing throughout the United States." 42 U.S.C. § 3601. A significant component of that policy is the FHA's anti-discrimination provisions. First, the FHA makes it unlawful "[t]o discriminate in the

sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter" because of race, color, religion, sex, familial status, national origin, or disability. *Id.* § 3604(a), (f)(1). Second, the FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, [] national origin . . . [, or] a handicap." *Id.* § 3604(b), (f)(2).

Under both provisions, a plaintiff may assert a disparate-treatment claim of disability discrimination, under which "a plaintiff must show (1) that a person residing in or intending to reside in the dwelling after its sale or rental to the plaintiff had a handicap as defined in the FHA, (2) that the plaintiff sought and was qualified to purchase or rent the housing, (3) that he was rejected [or refused particular terms, conditions, or privileges], and (4) that the rejection [or refusal] occurred in circumstances giving rise to an inference of discrimination on the basis of the handicap of the person residing or intending to reside with the plaintiff." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 152 (2d Cir. 2014); *accord Ricketts v. Westwood Condo Ass'n*, No. 3:23 Civ. 1079 (SVN), 2025 WL 969547, at *8 (D. Conn. Mar. 31, 2025). In effect, this standard requires a plaintiff to "show[] that animus against the protected group was a significant factor in the position taken" in order to establish a *prima facie* case. *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (internal quotation marks omitted). If such a *prima facie* case is established, then "the burden of production shifts to the defendants to come forward with a legitimate, nondiscriminatory reason for their decision," and if "the plaintiff make[s] a substantial showing that the defendants' proffered explanation was false, it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the defendants' explanation." *Olsen*, 759 F.3d at 152-53 (citation modified).[10]

[10] While plaintiffs may also bring an FHA claim under a disparate-impact theory, *see Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015), that

Plaintiffs may also prove disability discrimination under the FHA by showing "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); *see Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003) (holding, in the context of the Americans with Disabilities Act ("ADA"), that a "plaintiff who wishes to proceed on a reasonable accommodation theory [need not] also establish disparate [treatment]").[11] "[T]o prove a failure-to-accommodate claim, a plaintiff must show (1) that the plaintiff or a person who would live with the plaintiff had a handicap within the meaning of [the FHA]; (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation." *Olsen*, 759 F.3d at 156.

Under the failure-to-accommodate standard, a defendant "must have had an idea of what accommodation [the plaintiff] sought prior to their incurring liability for failing affirmatively to grant a reasonable accommodation." *Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d Cir. 2012). Additionally, a reasonable accommodation is one "where the cost is modest and [it does] not pose an undue hardship or a substantial burden on the housing provider." *Olsen*, 759 F.3d at 156; *see also McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("Although a

standard is not relevant here.

[11] Decisions interpreting the ADA and the Rehabilitation Act often apply equally to the FHA. *See Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) ("Because Section 504 of the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem."); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 335 (2d Cir. 1995) ("[T]he term 'reasonable accommodation' [in the FHA] was intended to draw on the case law under section 504 of the Rehabilitation Act.").

public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice."). Finally, and unlike a disparate-treatment claim, a failure-to-accommodate claim does not "require[] that the denial of modifications or accommodations be the result of a discriminatory animus toward the disabled." *Austin v. Town of Farmington*, 826 F.3d 622, 627 (2d Cir. 2016).

**B. Analysis**

Plaintiffs have consistently argued that Defendants violated the FHA by failing to accommodate their disabilities.[12] *See* Pls. Motion at 1 ("This case arises under the Fair Housing Act's plain command that housing providers make reasonable accommodations . . . ." (internal quotation marks omitted)); Pls. Supp. Br. at 2 ("Plaintiffs have consistently litigated Defendants' failure to provide a reasonable accommodation—not disparate treatment."). In their submissions, however, Plaintiffs have offered competing accounts of what purported accommodation they were denied. Initially, Plaintiffs appeared to argue that the relevant accommodation was a transfer to a larger unit—not merely placement on the waiting list for such a unit—on the theory that a larger unit was required in light of Bizelia's and Matevosyan's disabilities. *See* Pls. Motion at 10 ("Plaintiffs' treating physicians consistently stated that a larger unit was medically necessary for their health and safety. Without such an accommodation, Plaintiffs were denied the equal opportunity to use and enjoy their housing."); Am. Compl. ¶ 37 ("Plaintiffs have supplied Defendants with supporting documentation of their respective medical conditions and disabilities, and their requests to transfer to a new apartment to accommodate their needs. Defendants have not

[12] One of the Plaintiffs, Harutyunyan, is not herself disabled, but she is "the primary caretaker of Mr. Bizelia and Ms. Matevosyan," as well as their co-tenant. Pls. Motion at 8; *see Ricketts*, 2025 WL 969547, at *9 n.10 ("[T]he FHA contemplates a plaintiff bringing an FHA reasonable accommodations claim if someone with whom they would live has a handicap, even if the plaintiff is not himself handicapped.").

granted their requests."). But Plaintiffs' latest submissions disclaim ever making such an argument. *See* Pls. Supp. Br. at 2 ("Plaintiffs did not seek a larger apartment regardless of their position on the waiting list or their eligibility for such a unit."); Pls. Supp. Reply at 10 ("Defendants can prevail only by recasting the requested procedural accommodation as an immediate transfer without regard to eligibility, waiting-list position, or HPD approval. Plaintiffs expressly disclaim that request.").

Now, Plaintiffs insist that they have only ever argued that Defendants failed to accommodate them by refusing to *place them on a waiting list* for a larger unit. *See* Pls. Supp. Br. at 12 ("[P]lacement on the waiting list was necessary to afford Plaintiffs an equal opportunity to use and enjoy their housing."), 13 ("Plaintiffs asked Defendants to treat their repeated written medical-transfer requests as sufficient to trigger placement or processing on the internal two-bedroom waiting list."); Pls. Supp. Reply at 8 ("[Plaintiffs] ask to have their repeated written requests treated as sufficient to enter—and remain within—the internal transfer process . . . . That accommodation does not reorder the Mitchell-Lama waiting list after Plaintiffs are placed on it, alter the occupancy standards governing a two-bedroom apartment, or constrain HPD's ultimate approval authority."). That argument fails for two reasons. First, under the FHA, placement on a waiting list is not an "accommodation" of Plaintiffs' disabilities. Second, Plaintiffs have not shown that they requested or were denied such an accommodation. The Court addresses each point in turn.[13]

[13] In addition to their failure-to-accommodate argument, Plaintiffs argue in passing that, by failing to place them on a waiting list, Defendants violated 42 U.S.C. § 3617, which makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the FHA]." *See* Pls. Motion at 15-16. This argument misses the mark. To prevail on a Section 3617 claim, a plaintiff "must show that [he] was engaged in protected activity, that the defendant was aware of this activity, that the defendant took adverse action against the plaintiff, and a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action."

### 1. Plaintiffs Were Not Denied an Accommodation Under the FHA

Plaintiffs' argument that Defendants violated the FHA by failing to place them on a waiting list for a larger unit elides the distinction between a failure-to-accommodate claim and a disparate-treatment claim. *Cf. Stapleton v. Prince Carpentry, Inc.*, No. 22 Civ. 4044 (NCM), 2025 WL 2591519, at *13 (E.D.N.Y. Sept. 8, 2025) (explaining, in the context of the ADA, that "disparate treatment and failure to accommodate claims are conceptually distinct").

By definition, an "accommodation" is an "adaptation, adjustment, or allowance" made in light of a person's disability. *Accommodation*, Black's Law Dictionary (12th ed. 2024); *see also US Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) ("By definition any special 'accommodation' requires [treating someone] with a disability differently, *i.e.*, preferentially."). And because an accommodation entails catering to a person's "known physical or mental limitations," *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003) (internal quotation marks omitted), "the duty to make reasonable accommodations is framed by the nature of [a person's] particular handicap," *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 301 (2d Cir. 1998). For example, a seeing-eye dog is an accommodation for a blind tenant, but it would not be an accommodation for a quadriplegic tenant. *See id.* (collecting cases where accommodations were "shaped by the handicap" of the plaintiff).

By contrast, a disparate-treatment claim entails more straightforwardly "treating [an] individual with a disability differently because of the disability." *Davidson*, 337 F.3d at 1188

---

*Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002) (citation modified). And in this context, "[t]he term protected activity refers to action taken to protest or oppose statutorily prohibited discrimination." *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 278 (S.D.N.Y. 2019) (internal quotation marks omitted). But Plaintiffs are not claiming they were retaliated against for opposing discrimination—they are asserting that they were discriminated against in the first instance. Plaintiffs' claims therefore rise or fall under Section 3604, not Section 3617.

(internal quotation marks omitted); *see also Brooklyn Ctr. for Psychotherapy, Inc. v. Phila. Indem. Ins. Co.*, 955 F.3d 305, 311 (2d Cir. 2020) ("Disparate treatment is the most easily understood type of discrimination. The [defendant] simply treats some people less favorably than others because of their race, color, religion or other protected characteristics." (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993))). For example, a failure-to-accommodate claim might allege that a defendant illegally refused a blind tenant's request for a seeing-eye dog notwithstanding that non-disabled tenants were also not allowed dogs, whereas a comparable disparate-treatment claim might allege that a blind tenant was denied a dog even though other tenants *were* allowed dogs. *Compare Henrietta D.*, 331 F.3d at 273 (explaining that a disparate-treatment claim entails "plaintiffs identify[ing] a comparison class of similarly situated individuals given preferential treatment" (quoting *Olmstead v. L.C.*, 527 U.S. 581, 598 (1999))), *with id.* ("[For] a reasonable accommodation claim . . . the relevant inquiry asks not whether the benefits available to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled.").

This difference between a disparate-treatment claim and a failure-to-accommodate claim under the FHA informs why the former requires proof of discriminatory intent whereas the latter does not. *See Austin*, 826 F.3d at 627; *cf. Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 797 (10th Cir. 2020) ("This distinction between disparate-treatment claims and failure-to-accommodate claims . . . explains in part why the question of intent is treated quite differently as to each."). Because an accommodation is an allowance needed in light of a disability, a failure to provide such an allowance, when it is reasonable, evinces discrimination on the basis of that disability. *See Kueh v. N.Y. & Presbyterian Hosp.*, No. 23 Civ. 666 (VSB), 2024 WL 4882172, at *5 n.3 (S.D.N.Y. Nov. 25, 2024) ("[T]he failure to accommodate itself constitutes the unlawful discrimination, so no discriminatory intent is needed."); *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017)

("[The] failure to provide a reasonable accommodation for the disability establishes the required nexus between the disability and the alleged discrimination without the need to delve into the [defendant's] subjective motivations."). But the same is not true of all unfavorable treatment of disabled people. For example, denying a blind tenant a seeing-eye dog evinces discrimination, but denying a quadriplegic tenant a similar pet does not evince discrimination absent additional "circumstances giving rise to an inference of discrimination on the basis of the[ir] handicap." *Olsen*, 759 F.3d at 152.

In light of this distinction, not every instance of alleged discrimination can be brought as a failure-to-accommodate claim. For instance, if a disabled person is treated *less* favorably than a non-disabled person, as opposed to being denied a special "adaptation, adjustment, or allowance," Black's Law Dictionary, *supra*, then that person has not been denied an accommodation. *See Reg'l Econ. Cmty. Action Program*, 294 F.3d at 53 ("The plaintiffs do not seek a variance to a traditional rule or practice that was neutrally applied. Rather, they challenge [that] defendants' specific decision [was made] for discriminatory reasons. . . . [As such], they fail to state a claim under a reasonable accommodation theory."); *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1283 (7th Cir. 1996) ("[A] disparate treatment claim[ and] a reasonable accommodation claim . . . must be analyzed differently.").

Additionally, to show that they were denied an accommodation, a plaintiff must have requested a special adaptation, adjustment, or allowance that "meets and fits their particular handicap." *Salute*, 136 F.3d at 301. For example, if a deaf person requests that a landlord adjust his typical practice by accepting a Section 8 voucher, that would be a special allowance, but it still would not be an *accommodation* because the allowance is not "shaped by the handicap" of deafness—as compared to a non-disabled person, a deaf person is no less able to rent without using a Section 8 voucher. *Id.* at 301-02 (concluding that "a landlord's participation in the Section 8

program should [not] be deemed an 'accommodation' (regardless of its reasonableness) within the meaning of the statute"). To be sure, for some impoverished people with disabilities, it might be necessary to accept a Section 8 voucher in order "to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). But not every change in "rules, policies, practices, or services" is an accommodation. *Id.*

Applying these principles to the present facts, placement on an apartment waiting list is not an accommodation within the meaning of the FHA. First, Plaintiffs have consistently argued that Defendants' refusal to place them on a waiting list treated them worse than other tenants—not that it was the denial of a special "adaptation, adjustment, or allowance," Black's Law Dictionary, *supra*. *See* Pls. Motion at 11 ("[Plaintiffs sought] nothing more than what any tenant, regardless of disability, would routinely receive through Clinton Towers' standard transfer process."); Pls. Reply at 6 ("Defendants' discrimination succeeded in making continued pursuit [of a transfer] futile."). Indeed, Plaintiffs' summary judgment briefs argue that they complied with the policy that Clinton Towers follows with respect to non-disabled tenants by submitting a written request to transfer, and yet Defendants refused to place them on a waiting list due to animus towards disabled people. *See* Pls. Reply at 1-2 (arguing that "Plaintiffs submitted exactly [the] type of written notification" required to be placed on the waiting list, but "management harbored discriminatory animus toward Plaintiffs because of their disabilities"); Pls. Motion at 21 ("[D]iscriminatory animus [was] driving the obstruction."). For reasons explained above, this sort of alleged failure to treat disabled people equally cannot be recast as a failure to accommodate.[14]

[14] In theory, Plaintiffs could have argued that Defendants' allegedly inequitable conduct constituted disparate treatment. *See Davidson*, 337 F.3d at 1188 (describing disparate treatment as "treating [an] individual with a disability differently because of the disability" (internal quotation marks omitted)). But as Plaintiffs readily acknowledge, "[t]he record . . . contains no comparator evidence of the kind a disparate treatment claim would require." Pls. Supp. Br. at 7.

In their supplemental summary judgment submissions, Plaintiffs try to avoid this shoal by shifting theories about what "accommodation" they were denied. Instead of arguing that they satisfied Clinton Towers' policy for placement on a waiting list and that placement on such a list is an accommodation, Plaintiffs contend that, regardless of whether they complied with the transfer policy, Defendants should have accommodated them by not "allowing a disputed [application] requirement to prevent them from entering the [transfer] process." Pls. Supp. Br. at 13; *see id.* ("If Defendants are correct that an HPD approved form was required before placement on the list could occur, then the refusal to deem Plaintiffs' repeated written medical-transfer requests as sufficient to preserve or process their request was a failure to accommodate."). This argument too fails. Altering CT Housing's transfer policy to allow for written submissions not using an HPD-approved form is not an accommodation of Plaintiffs' disabilities because, crucially, such an adjustment would not be "shaped by [Plaintiffs'] handicap." *Salute*, 136 F.3d at 301. As explained above, Bizelia has a "mood disorder, Obsessive Compulsive Disorder, [and] Generalized Anxiety Disorder," Cyr Decl., Exh. H (3/22/2022 medical note), and Matevosyan is an "elderly [woman] who suffers from [a] heart condition, high blood pressure, anxiety and hypertension," Cyr Decl., Exh. K (10/21/2019 medical note). But nothing about these conditions makes it more difficult for Plaintiffs to use an HPD-approved form as compared to a non-disabled tenant. *Cf. Salute*, 136 F.3d at 302 ("[Disability is not w]hat stands between these plaintiffs and the apartments."). This case is therefore materially indistinguishable from *Salute*. In *Salute*, as here, a change in policy was arguably necessary "to afford [Plaintiffs an] equal opportunity to use and enjoy a dwelling," 42 U.S.C. § 3604(f)(3)(B), but such a change is nonetheless not an accommodation within the meaning of the FHA. *See Salute*, 136 F.3d at 301-02.

**2. Additional Issues**

Even if accepting transfer requests that are not submitted on an HPD-approved form were

an accommodation, Defendants would still be entitled to summary judgment for two independent reasons.

First, a failure-to-accommodate claim requires that the defendant "had an idea of what accommodation [the plaintiff] sought." *Taylor*, 690 F.3d at 49; *accord Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 579 (2d Cir. 2003) ("A governmental entity must know what a plaintiff seeks prior to incurring liability for failing to affirmatively grant a reasonable accommodation."). But here, Plaintiffs made no such request. While Plaintiffs sent Defendants numerous letters between 2016 and 2021, each of those missives sought placement on a waiting list or a transfer to a larger apartment—not a change to the procedures by which transfer applications must be submitted. *See* Cyr Decl., Exh. R (November 21, 2016 letter) ("requesting that you please add our name to 2-Bedroom Terrace Apt A.S.A.P."); Cyr Decl., Exh. S (July 2017 letter) ("We need to be moved to 2-bedroom apartment as soon as possible."); Cyr Decl., Exh. V (April 19, 2018 letter) ("This is second request for apartment transfer."); Cyr Decl., Exh. W (June 7, 2018 letter) ("We need to be transferred to 3-bedroom apt. asap. due to our serious health risks."); Cyr Decl., Exh. X (February 4, 2019 letter) ("Our letters regarding of 3 bedroom apartment upgrade expired couple of times as management stated and we filed it again."); Cyr Decl., Exh. Z (April 2, 2020 letter) ("We need an apartment transfer to 2 or 3 bedrooms since We are three people in one bedroom apartment."); Cyr Decl., Exh. AA at 1 (May 7, 2021 letter from counsel) (requesting "a reasonable accommodation of [Bizelia's] disability to transfer [into] a two-bedroom apartment"). Indeed, in over half a decade of communications, Plaintiffs did not even once mention that transfer applications had to be submitted using an HPD-approved form.

Second, Plaintiffs' entire argument assumes that they were never placed on a waiting list, but no evidence in the record actually supports that assumption. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (explaining that a party opposing summary judgment "may not rely

on . . . unsubstantiated speculation" (internal quotation marks omitted)). Although Plaintiffs were not permitted to *move into* a two- or three-bedroom apartment, under Mitchell-Lama placement on a waiting list is several steps removed from occupancy. Plaintiffs point to Sabovik's August 2018 stating that "CT Management has a 2 Bedroom to show you," Sabovik Email at 1, but regardless of whether CT Housing wanted to "show" Plaintiffs a unit, there still may have been other tenants ahead of Plaintiffs on the waiting list. Similarly, although Harutyunyan avers that Blaine showed her "a three-bedroom apartment and a two-bathroom apartment, which [Blaine] described as 'both available immediately,'" Harutyunyan Decl. ¶ 9, that does not mean those units were available immediately *to Plaintiffs*, as opposed to other tenants with higher priority. In fact, Harutyunyan herself even acknowledges that Plaintiffs *were* placed on a waiting list, because Blaine notified her at one point that they "were first on the waiting list for a transfer to a two-bedroom apartment." *Id.* ¶ 7. Ultimately, no reasonable juror could look at this set of facts and conclude that Plaintiffs proved they were excluded from a transfer waiting list.

* * *

In sum, Plaintiffs have not shown that placement on an apartment waiting list—or the acceptance of transfer requests not submitted on an HPD-approved form—constitutes an accommodation within the meaning of the FHA. But even if they had, Plaintiffs also fail to create a dispute of material fact as to whether they actually requested and were denied such an accommodation.[15]

[15] Plaintiffs briefly argue that "[t]he FHA required Defendants to engage in an interactive process to clarify requirements and provide procedural accommodations." Pls. Motion at 16. To be sure, "some courts have imposed an obligation on *employers and employees* to engage in an interactive process," but "there is no such language in the Fair Housing Act or [even] in the relevant sections of the Department of Housing and Urban Development's implementing regulations that would impose such a duty on landlords and tenants." *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1047 (6th Cir. 2001) (emphasis added). Moreover, even if such a requirement existed, Plaintiffs' own evidence suggests that there was an open dialogue between Defendants

### IV. Conclusion

For the reasons stated above, Plaintiffs have failed to establish a dispute of material fact as to whether they were denied a reasonable accommodation under the FHA. The Court therefore denies Plaintiffs' motion for summary judgment and grants summary judgment to Defendants pursuant to Federal Rule of Civil Procedure 56(f). The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

Dated: August 19, 2026
New York, New York

JOHN P. CRONAN
United States District Judge

---

and Plaintiffs during the relevant period. *See, e.g.*, Piantadosi Decl. ¶ 34 (averring that P&L forwarded Plaintiffs' application to HPD); Harutyunyan Decl. ¶ 9 (describing Blaine showing Harutyunyan apartments); Sabovik Email (responding regarding Plaintiffs' transfer request).